Case No. 15-1529 USA v. Abdul-Malik Al-Jumail Oral Arguments Case No. 15-1527 and 15-1528 10 minutes for each defendant, 20 minutes for the plaintiff. Case No. 15-1529 to be submitted on the briefs. Thank you. How have you all done? Go ahead. Wendy Barnwell for Appellant Felicar Williams. Good morning. How are you? You're going to go 10 minutes, your colleague is going to go 10 minutes, and then the government is going to go 20 minutes. Is that how it works? Subject to your rebuttal time. Go ahead then. Yes. I am Wendy Barnwell and I represent defendant Appellant Felicar Williams. And I am, you know, it was a very huge case, 12 weeks, and I did attempt to address issues in writing. And I am adopting everything that I've said previously. But what really bothered me mostly in this case, I do a lot of trial work, I do a lot of appeal work, but it's the 404B evidence and the testimony from the Tanya Odom that was allowed with respect to something my client allegedly did at TGW, a prior employer where she worked at. And I argued about this in my brief. And nothing that happened at TGW flowed into what happened at Haven. The only thing we had was the Tanya Odom testifying about my client making the same thing happen there. And I think that the court was supposed to establish that the court did make a preliminary finding, yes, it happened. Something happened at TGW. People were prosecuted at TGW. There was a Louisa Thompson that was prosecuted. The case was, there was a complete criminal investigation. Louisa Thompson was prosecuted and pled guilty. Carol Robertson was prosecuted and pled guilty. She was raised in the trial court, right? It was. Absolutely addressed. The district judge under 404 allowed the evidence to be submitted to the jury. On what theory? She was indicating that it showed a prior pattern, a pattern of conduct. I'm sure that wasn't it. That would be exactly what the rule prohibits. Sorry, Judge Mayer. I thought it perhaps was intent. Yeah, to show that there was no accident on the part of my client. What's wrong with that theory? I think that there should have been evidence independent, not just what LaTanya Odom said, but evidence independent that my client was involved in what happened in terms of criminally liable at TGW. Other than what LaTanya Odom now conveniently testified to. Because there was a thorough investigation by the federal government, and she was not implicated in any way. But what you had was Odom parroting the government's stand as to what she allegedly did at Haven. And I think that that was substantially prejudicial. When you use the balancing test, when you apply the balancing test, it was substantially more prejudicial than probative. Is your argument that she wasn't convicted of that? It's not that she was convicted, because I know you don't have to be convicted to have a prior bad act come up. The argument that there's no evidence that she did it? No evidence independent of the testimony of LaTanya. Why isn't the testimony? I mean, why does it have to be independent? I mean, testimony is testimony. I cited a case that talked about the court establishing through preliminary finding that the act occurred. Something occurred at TGW, but they didn't show that my client did the stuff that occurred at TGW. Apart from LaTanya Odom's testimony. Okay. Who was LaTanya Odom? She was a worker who did work at TGW and did work. I mean, why isn't that evidence? I mean, I don't know. I'm not following. Do you have to have special kinds of evidence in order to present evidence? I mean, do you see what I'm asking? I'm trying to get the nature of the argument. Even if it was admissible, I think it was substantially more probative than prejudicial. And I think it pointed to a bad character trait on her part. I think that was like... That's what the government was trying to prove, wasn't it? I mean, that was their burden of proof to show that she was acting in a criminal way in these fraud situations. That's their burden of proof. But if they were doing it for propensity reasons, it would be prejudicial. Yes. But if they were doing it for knowledge of what kinds of things go on in these kinds of places, it would not be prejudicial because it would show that she knows that these things are going on and contribute to the argument that she knew what she was doing. That's the intent argument. And isn't the district judge supposed to balance that? Yes. Well, what would be the basis for our overturning that balance? Just that we disagree. Do you see what I'm asking? Yeah. Well... What else do you want to tell us? Yeah, what else? What was your client's theory of the defense? I mean, what was... I'll just leave it at that. Well, that she did not... She had nothing to do with billing. She had nothing to do... She did not control, own, as they painted it, that she ran the business at Haven. She was just a person receiving a modest salary of $800 a month. Or $800 biweekly, rather. Every two weeks. Was it that she didn't know this stuff was fraudulent? You know, these therapy sessions and all that? Was it... I'm trying to understand the theory of your defense to map it on to how this evidence would... That would be sort of the balance, right? She did not control anything that was happening there. She did not participate in... Well, I know they brought in testimony to say that she did participate. Basically, they didn't know anything. Okay. That she did not control anything to do with billing. That was what she was indicating. Odom and other people came in and said, well, she gave us instructions on what to do. Counsel, you argue, and there are several cases here, I want to make sure I'm clear. It's your argument that it's... Part of your argument on appeal is that your client didn't have an ownership stake in the company? Well, her liability... Was that an argument you made? On appeal? Well, I did talk about sufficiency of the evidence, but that's not my big issue. I did write... She requested that I argue sufficiency of the evidence, and I did. But I understand that's not the strongest argument. I get that. But in terms of... She was an employee who... And Dr. V. Gore, when she was the one who was acquitted, her testimony went into what actually happened there. And I know this appellate panel doesn't have the same function as a jury. But she's indicating that she was just an employee there. She was not an owner. She had nothing to do with accounts. She had no access, deposits, withdrawal, anything of that sort. She had nothing to do with setting up the Medicare, you know, when they became eligible for Medicare. How much of a sentence did she get? Pardon? How much of a sentence did she get? She got 16 months, five years. Five years? Yes. You don't raise a question about that, I tell you. Pardon? You don't raise a question about that. I argued that her sentence should be lower. But, I mean, I've argued that in writing. Do you have some sentencing claims in your brief or not? I do. Okay. Time's about up. Do you have anything else you want to raise at this point? No. Okay. Well, we appreciate your advocacy. Thank you. Thank you. Good morning. My name is Maria Manarino, and I represent a young woman by the name of Jamila Al-Jamail. I had the pleasure of, honor of representing her in the trial court. I was the trial attorney in this matter. And I am, after 30 years of practice, I am thrilled to be here in the Court of Appeals for the first time. Well. This is a, first of all, I will, of course, rely on what I submitted. And I will join co-counsel in stating that this was a lengthy trial that was very, very difficult, very, and it was a very emotional case also. And I appreciate the opportunity now to follow this through. Ms. Al-Jamail was convicted of two separate counts and is currently serving a 48-month sentence. There were, and I have set forth in my brief and in my arguments, a number of issues that were so problematic during the trial of this case. And I, you know, I've set forth, but my primary issues is that I don't believe, and, you know, I will not concede a sufficiency of the evidence argument. I don't believe that there was sufficient evidence of a conspiracy. There, Sachin Sharma was the ultimate powerful con man. He set everything that man touched, every business he set up, everything he had his fingers in, was a scam and a, you know, an effort to enrich Sachin Sharma. He turned around and testified against all the people he got involved in the case. Amazing. Amazing. And there ought to be some law against that, but there isn't. And, you know, and quite frankly, well, a whole different issue, but the sentence that man received and his ability to still access the millions of dollars he sent overseas is mind-boggling. What happened to him, by the way? He was ultimately sentenced. I was so offended I don't recall. I blocked it out of my mind, the sentence that man received. We have to focus on your strongest arguments. Okay. There, you know, multiple, but there was not one conspiracy that everybody was a part of. I never understood why Ms. Al-Jamal was tried with, you know, Ms. Felicar. They had nothing to do with each other. And what was going on at Haven had- Is that the argument you're raising right now? Well, just in terms of sufficiency, there was insufficient evidence of a single conspiracy that Ms. Al-Jamal was a part of that she knowingly joined and participated in. There was not one conspiracy. What's the closest they came to proving it? They had the testimony of Sachin Sharma who said, I provided this young woman with information she needed to, you know, run the business that her father owned. At her father's request, I provided these documents to her and told her this is how you go set up the company. There was evidence she knew that it was for fraudulent purposes. No, I don't think there was any evidence that she understood. We're going to ask your opponent what evidence there was and she's going to cite something. And what she cited in her brief is that Ms. Al-Jamal directed others to do certain things. That she was responsible for creating documents that were relied on to bill Medicare and that's just not what was presented at trial. There was no evidence at trial. Are there any citations in her brief that are not supported in the record? Well, I think she mis- I mean, that's a fair argument. Yeah, she misinterprets the testimony. Can you point us to those? I'm sorry? Can you point us to those? We'll ask her about them. She refers in her brief to the fact that Ms. What page are you on? Well, you know, starting in her statement of facts, you know, she alleges that- You can't follow along unless you give me the page number. Okay. Starting at the statement of facts on page four, that the company was bought for his daughter to run. No proof of that. No evidence of that. The fact that her father may have purchased this company from Mr. Sharma and then at some point got one of his three children- He did purchase it and he did give it to her to run, though, right?  She worked there as a ministerial clerk. She ran it, though, or she didn't run it. Well, again, and that's where words are powerful. That's why I'm trying to parse them here. Yeah, when she didn't run the company, the evidence from- So there's not evidence that she ran the company? I think the evidence was contrary, absolutely. Was there testimony she did? No. I don't think there was testimony she did. There was description of what her role was there. Her role was to direct, you know, to make sure that the lab specimens were picked up, that the paperwork was done to make sure that everybody else was- But her job was not to do any of those things. She was preparing paperwork, though, right? She was making sure the paperwork was done. The paperwork was fraudulent, right, or not? There was evidence that the paperwork was fraudulent. Is that right or not? Well, just as a brief overview of what was going on, the allegation is that everything that was going on was fraudulent. It wasn't. There were real nurses, real doctors, real physical therapists, real people seeing real patients, and- There was also evidence, if I remember, that some of these people were not qualified, some of these people were not participating, some of it was not legitimate. Was there that evidence or not? There was that testimony from- Well, we're here on appeal. We can't second-guess the jury. If there's evidence that there was fraudulent stuff going on, the fact that there was some legitimate stuff going on is either here or there. Well, but it is in terms of going back to what Ms. Al-Jamal's role was and what her knowledge was. Her role was processing or preparing this paperwork, right, or not? Or making sure that it was done. When nurses and physical therapists went to visit patients, they came back and they would give her files that she- Are there parts of the government's brief where they're citing things that are incorrect or not supported in the record? There can't be too many pages that deal with this because there's so many issues in here. I can't right now, without wasting too much time, go through and pick them out. What I will say is that there is a flavor that was set forth that the evidence that was submitted at trial doesn't support. I don't know that there was any dispute that she was her father's daughter doing ministerial work and was- Your argument is there isn't evidence that the work she did, that she knew it was wrong? She thought what was going on was fine? Not only did she-that there's no evidence that she knew that this was wrong. When she's got Sachin Sharma, this respectable, rich, powerful businessman, saying, this is how you do things, this is how- Maybe he coerced her into doing something illegal. Who knows? Maybe he persuaded her or maybe she was obsessed by him. But that's not the issue. The issue is whether the jury could believe that she did things that she knew were fraudulent. Sachin Sharma never said that he told her anything. And it would be ridiculous to think that this man took this young girl aside and said, I'm committing massive fraud. Come and join me. Sachin Sharma never said that he told Ms. Al-Jamal or that he gave her this information about what was going on and she willingly joined. The real question, what the prosecutor says, is at some point she must have realized this was bogus. Why can't you do that? Can a prosecutor do that? Well, except that what Ms. Al-Jamal then did, let's look at what her participation was. If she is creating these false documents or directing these false documents, were these false documents then used to bill Medicare and to defraud? And that's where we have a total then breakdown of the evidence that was presented. Not a shred of evidence that any of these documents were used by any biller to bill Medicare. Thank you. That's your strongest argument. You're not giving up any of your other arguments. I'm not giving up any of my other arguments. But that, yes, that was one of the, the government told the jury in their opening, you're going to hear from the Medicare biller. You're going to hear that this person, you know. That's another issue that's in your brief. Yes. Absolutely. I think your time is up. Oh, is it? Yep. There's a red light there. It's kind of like. It's not funny. You know what? We love listening to you, but we got to go. You know, the trial attorneys, you know, get caught up with the sound of their own voices. We hope you come back to the Sixth Circuit in the future. Thank you. Thank you. May it please the Court, Pamela Tessier for the United States. I'd first like to address something that counsel for Ms. Algemail just mentioned. She said that there was no evidence that the Medicare was billed based upon the information in the falsified therapy notes. But, in fact, defendants stipulated at trial, and this is at page 7824 of the record, that Accessible billed Medicare for payment based upon the information contained in Mackey's falsified notes. There was also ample evidence that Ms. Algemail did, in fact, run the day-to-day operations at Accessible. Granted, her father appears to have directed her day-to-day control of the organization, but both Ms. What kind of evidence is there? She says there's no evidence that she ran it. Both Ms. Lopez and Mr. Mackey, Ms. Lopez in particular at 6824-26 of the record said that she was Say it more slowly. Where? I'm sorry. Pages 6824-26 of the record stated that she was hired by Ms. Algemail, and at 6849-62 of the record stated that Ms. Algemail taught her the system by which they created the dates for the falsified notes. Running the company is sort of a looser general way to say that she did key things for the company, like hire people and teach them how to do the job. I think the language we use in our brief, which is an accurate description of the testimony at trial, was that she ran the day-to-day operations of the company. She may not have been the CEO of the company. She may not have had full ownership of the company, but she ran its day-to-day operations. That's the best evidence that in doing so she knew that it was directed at fraudulent submissions. I'd point the court to three particular pieces of evidence. First, when Ms. Lopez asked the Medicare biller if she believed that everything was legitimate, Ms. Algemail then came back to Ms. Lopez and said, I don't talk to anyone except for me or my father. That's at pages 6879 and 80 of the record. She criticized Mr. Mackey for not varying sufficiently the falsified notes that he was using to support the therapy sessions. They looked too much alike. And, of course, the jury could infer from that that her concern was that Medicare would see these notes and think they must be falsified because they're all identical. That's at pages 6582 to 84 of the record. And then finally, of course, was Ms. Algemail's obstructionist conduct when she learned that her father had been arrested in connection with ABC, which was one of his other home health care companies. She arranged for an employee of B-Well, which was another one of the many companies involved. She arranged for that person to collect documents from Accessible, and they were brought to a family member's home and burned. And, of course, the inference that she knew that there was stuff in there. Was she just protecting her father then? That's correct. Did the jury infer that she knew that there was bad stuff in there? As the district court explained when denying Ms. Algemail's post-trial motions, a jury could reasonably infer from the trial evidence that Ms. Algemail worked at ABC, and therefore they could infer that she knew of the fraud at ABC, and that she was worried that the government would learn about the same fraud at Accessible, and so she therefore destroyed the Accessible documents. And there was corroborating testimony from, I believe, an agent and an Accessible employee, but forgive me, I'm not positive on that, that those documents did disappear. Could I ask a question about Ms. Williams now? Certainly. There was some discussion. I know that counsel for Ms. Williams on oral argument wasn't really arguing sufficiency of the evidence, but she does argue it in the briefs. That's correct. And part of the argument, as I understand it, let's see if I can find my notes. Pardon me. I'm thinking about this business about whether she owned the company. There was challenge to the fact that she was part owner of the company. I'm not finding it right. Hold on a second. Yeah. That Ms. Williams, she challenges the idea that Ms. Williams benefited from Haven's fraud by virtue of her ownership stake in the company. And your response to that is what? Well, I think that relates to two different issues. First is the sufficiency of the evidence argument. That's the one I'm talking about. As to the sufficiency of the evidence argument, first the court has to construe the evidence in the light most favorable to the government. And Mr. Sharma did testify that Ms. Williams was a co-owner of the company. Her mother, Ms. Wright, also testified that the company was set up so that she and Mr. Sharma would own it together. Now, they claim that that ownership stake never took place. Right. And your response in your brief wasn't what you just said, which is, but there's evidence that there was. I thought your argument was it didn't matter because she benefited anyway. You're correct, Your Honor. It doesn't matter. Why doesn't it matter? Ask my question. She wasn't convicted because of her ownership in the company. She was convicted because of the role that she played in defrauding Medicare. She doesn't benefit from the fraud, though, does she or not? No, she does not have to benefit from the fraud in order to be convicted of the fraud. She just has to agree to defraud Medicare. And she did, in fact, agree to defraud Medicare. And this is a conspiracy charge, and, in fact, a conspiracy charge can be upheld even if there's no evidence that the scheme was actually committed, so long as there's an overt act. And, of course, it is black-letter law that with fraud schemes, we don't have to prove that the fraud itself is successful. She's only convicted of conspiracy? to defraud Medicare, and she was convicted of conspiracy to pay or receive kickbacks. She doesn't have to benefit from that? No, she doesn't. That's correct. You think there's evidence that she did, even though it's contested in the briefs? Well, she – I don't understand the arguments. There's a lot of arguments. Certainly. Certainly, she benefited by virtue of her salary. Now, admittedly, her salary was low. And with respect to sentencing, the court considered Ms. Williams' role in the conspiracy and the fact that there was some evidence that she was an owner, but there was certainly ample evidence that she ran the day-to-day operations of the fraud at Haven. I'd also note that while she may not have personally benefited in form of receiving the profits from Haven, there was also her personal benefit from the kickback conspiracy, which is that she received payments from Mr. Al-Jumail in return for providing Medicare patient information that he could use to fraudulently bill Medicare from his home health care companies. And I think there was evidence of approximately $80,000 that went to Ms. Williams and Ms. Odom in the form of checks to those two individuals and then also checks to Jacqueline Withers, an employee at Haven, who testified that Ms. Williams paid her to cash checks on her behalf. Thank you. You're with the criminal division, right? That's correct. The way these cases are fraud, Medicare cases are tried, now is the criminal division sort of taken over that or depends on the size of the case? Or how is that versus the United States Attorney's offices? I'm just curious how they're being worked. There are a lot of Medicare fraud cases that, you are correct, are being prosecuted in large part by the fraud section of the criminal division. Oftentimes, and perhaps even all the time, I couldn't speak to that. But I know the cases that I have worked on, there is usually a representative from the U.S. Attorney's office working on the case with the, yes, that's correct. And my understanding is these are always in consultation with the U.S. Attorney's offices. My understanding is there are also fraud cases brought by the U.S. Attorney's office. But you are correct that a lot of them are. How many of these Medicare-type fraud cases are there? I mean, what kind of statistical situation is it? Unfortunately, Your Honor, I don't have an answer to that question. I can tell you that I've A small cog in a big machine. I am a very small cog in this big machine. I can tell you that personally, this is, I have worked on three Medicare fraud cases in the last five to six months. And so I can tell you there are a lot. And the cost to the government is large. Thank you. If the Court has no further questions, thank you very much. Did you all reserve rebuttal time? No. I didn't reserve. Okay. The case will be submitted. And we appreciate your advocacy. We appreciate the defendant's advocacy and your appointment under the Criminal Justice Act. We appreciate your service. Thank you. The case will be submitted. Please call the next